ROBERT HAM, Administrator, etc., Respondent, *v.* TROY
AND SANDLAKE TURNPIKE, Appellant.

*Supreme Court, Third Department, General Term, July 6, 1889.*

1. *Negligence.  Highway.*—A person is guilty of contributory negligence,
   if he does not stop when he finds his wagon off the travelled road on
   an incline.
2. *Same.*—The turnpike company is under no obligation to extend wings
   across the untravelled part of its road.

*Henry A. King,* for appellant.

*Edgar L. Fursman,* for respondent.

LEARNED, P. J.—This is an action to recover for injuries
resulting in the death of the plaintiff's intestate.  A verdict
was rendered for the plaintiff.  From the judgment thereon,
and from an order denying a motion for a new trial, the
defendant appeals.

The deceased with a companion was driving westward
along plaintiff's turnpike, was precipitated down an embank-
ment on the south side and was killed.  The plaintiff alleges
that the defendant was negligent in not maintaining a guard
or railing along the side of the traveled way, which is alleged
to have been only eighteen feet wide at that place.

Deceased and his companion had started, about four
o'clock on Sunday afternoon, March 4th, from Troy in a
one-horse wagon, or buggy, for a drive.  They stopped at
Bloomingdale's and Miller's saloons in Albion, Witbeck's at
Wynants Hill, and reached Snyder's lake about dark, or
as one witness says about five o'clook.  They stayed there
three-quarters of an hour, and then started to return.  They
drove to Sliter's, about a mile and a half, and reached there
about twenty minutes of eight.

There is evidence that before they obtained the horse and

wagon at Troy, they had applied to two liverymen and been refused ; and there is evidence that one of them was then intoxicated, and both in the opinion of one witness. At some of the saloons mentioned above Benway, the companion of deceased, had drunk whisky. Ham, the deceased, is said to have drunk, but only soda or soda cocktail.

At Sliter's they came into the saloon and called for a soda cocktail. Each drank and then they went out. Sliter saw them, and testifies that he did not consider Ham, the deceased, an intoxicated man. Two witnesses who saw them there say that both were intoxicated. They went out to their wagon, Sliter standing on the stoop and holding a lantern. A boy held the horse, which was headed to the west, the direction of Troy. They got in and Ham took the reins. He told the boy to hold the horse until he could see if the reins were crossed, then said "all right," and they started. The night was starlight.

There had been a flurry of snow that afternoon, which covered the ground, and this enabled witnesses subsequently to follow the tracks of the wagon.

Sliter's was on the north side of the turnpike, and about thirty feet back from the outer line of the same. There was a driveway which turned off from the main traveled road and came up to the stoop of Sliter's, and then returned again to the main traveled road. The deceased had driven on this driveway up to the stoop from the east, and started to go back to the main traveled road. (It should be noticed that some witnesses speak of the direction towards Troy as "west;" others as "north.")

About seventy feet west from the stoop the traveled road is about twenty-six feet wide. At about that point the south, or left wheel of the wagon, had gone off the traveled road, going over what witnesses call the shoulder, that is the edge of the traveled road, and running upon the grass. In this manner, the deceased continued to drive for about 150 feet; the right hand wheel being on the traveled road

and the left hand being on the grass, " striding the shoulder," as expressed by one witness. Somewhere about this place, estimated by one witness at 250 feet from the middle of Sliter's barn (which is about opposite his stoop), the other wheel went off the traveled road. The companion, Benway, thought the horse was all this time running in a rut; thus showing that the wagon was beginning to tip towards the left.

For a considerable distance west of Sliter's (or of Sliter's barn), there is what the witnesses call a shoulder on the south side of the traveled way, for perhaps 225 feet, according to one witness. That is, the traveled way is raised a little above the grass at the side. This grassed part is comparatively level, but gradually grows steeper until at about 300 feet from Sliter's stoop it goes down rather suddenly. Here the road is on an embankment which, on the south side of the road, is some twelve feet high, sloping down to the fence that bounds the highway. And at this point the traveled way along the embankment is, according to the varying testimony, eighteen or twenty feet wide.

After both wheels were south of the traveled road as above stated, the deceased and his companion drove on. Soon the wagon tipped so much that Benway, who had his hands in his pockets, was thrown out. About fifteen or twenty feet further, according to Benway's estimate, the carriage was completely overturned, and Ham was thrown out and killed. This happened about 300 feet from Sliter's stoop and at the place above described, where there was a high embankment.

Now it will be seen from the foregoing statement that before the deceased reached the place of the accident, and for a distance of some sixty feet or more, he was driving quite off the traveled road, on a place growing more steep towards the left, and that his wagon, before the accident, was so much tipped that his companion fell out, and also that almost from his first start from Sliter's his left wheel had been off the traveled road and down on the grass.

The plaintiff claims that the defendants were guilty of negligence because they did not place a fender or railing along the side of the road at the place where the accident happened. Chap. 38, Laws of 1807. This he claims was also a common law duty. Hyatt *v.* Rondout, 44 Barb. 385.

The defendant denies that the act of 1807 is applicable under its charter. Chap. 27, Laws 1822; chap. 95, Laws 1805. And further urges that a railing is only required by these statutes where the road is not of the requisite width, and that at the place in question its road was of the requisite width.

We do not consider it necessary to decide the question whether or not it was the duty of defendant to keep a railing or fender along the side of the road where there was an embankment. If the deceased had been driving along the traveled way, and had come to the place where this embankment was, and if, without negligence on his part, he had gone off the embankment and been killed, it might then have been necessary to inquire whether the defendant had neglected its duty in this respect.

But that is not this case. Railings and fenders are to guard those who are on the traveled road from the danger of falling off. Just as on a bridge over a stream they are intended to guard those crossing the bridge. But the man who, before he reaches the bridge, leaves the traveled road and drives into the stream, does not perish for the want of a fender or railing on the bridge.

The plaintiff urges, however, that defendant should not only have put a railing or fender along the side of the traveled road where it went on the embankment, but that it should also have extended such railing or fender by means of a wing at each end, so as to prevent any one who might carelessly or recklessly drive along the side of the traveled road from going down this declivity.

Perhaps there might be exposed situations where that precaution would be called for. But in Hubbell *v.* Yonkers

(104 N. Y. 434), it was pointed out that it is not negligence not to guard against a contingency, " which never happened before, and which in its character is such as not to naturally occur to prudent· men." No evidence has been given of any similar accident before. No evidence that such an accident would naturally occur to a prudent man. The facts show the contrary. A prudent man finding that the left wheel of his wagon was running continuously on ground below that in which his right wheel was running, would suspect that he was off the road and might be in peril. If this position of the wagon increased so that at last his companion fell out, he would know that he was in danger and would stop.

Whatever might have been the duty of defendant as to a fender or railing along the side of the traveled road at the place of the embankment, we have no reason to think from any evidence in the case that they were under any duty to extend wings across the untraveled part of the road. And nothing but such a wing would have prevented the deceased from doing as he did. Monk *v.* New Utrecht, 104 N. Y. 552; 6 N. Y. State Rep. 484.

This point was presented by the defendant in a request to charge which was refused. The evidence, too, in the case does not seem to be in conflict as to the direction and course which the deceased took in driving from Sliter's.

While there may be some variations as to distances, the fact is plain that before the deceased had reached the place of the accident his wagon was entirely off the traveled road, and going directly towards the steep side of the embankment, where it was inevitably upset. Not only, then, the alleged negligence of the defendant did not cause the death of the deceased, but his own negligence contributed to it. He drove off from the traveled road. If he could not see, he could feel, that he was going wrong. A wagon does not travel smoothly when one wheel is on the traveled road and the other over the " shoulder " and down on the grass. His companion, Benway, testifies that the deceased was not

intoxicated, though he himself was not " strictly sober." If this be so, then at least the deceased was extremely careless or unskilled, and he brought his death on himself.

Judgment and order reversed, new trial granted, costs to abide event.